Martin, J.
delivered the opinion of the court. The plaintiffs rely on a possession of thirty years—a possession of ten years with a just title—the presumption of the surrender of the title of the original grantee—and a right of being substituted to the right of the defendants, on a suggestion that they purchased a litigious one.
I. The plaintiffs cannot avail themselves of Lesassier's possession. There is not any legal evidence of his having transferred any right of his. One of the plaintiffs' witnesses, Judice, deposes that Macarty, had an authentic title from Lesassier. None is produced, neither is there any legal evidence of the loss or destruction of such a title, nor of its contents. *171 The plaintiffs’ counsel urges that it was a private one, and was burnt in the conflagration of Macarty’s house, in 1794. The testimonial or procedure made by Macarty, after the conflagration, is an ex parte proceeding, but as it has been read without objections, has been considered by the court. The conflagration is thereby proved, but not a word is there said of the sale to Lesassier, nor of Lesassier’s to Ma-carty, nor of the original conveyances, though many papers of infinitely less importance are there detailed, with great minuteness. In the petition presented by Macarty to the intendant, in 1803, nine years after the conflagration, the sale from V. Lesassier to Macarty is spoken of as a private one, which was mislaid, extraviado, in a notary’s office, and the original titles for the land, which Macarty says had been delivered to him by Lesassier, are said to have been destroyed in the conflagration of his house. Yet, the original title to the premises, the grant from the Spanish government, does not appear ever to have been out of the possession of the grantee or his successors, and is annexed to the record. Neither is there any legal evidence that Lesassier ever possessed any land on the eastern side of the bayou, the side on which is the locus in quo, except the declaration of Boutte that Lesassier had told him he had sold to Macarty eighty arpens on each side of the bayou. Judice has sworn he was present when Lesassier purchased the *172 land of Chicot-noir, on the western side of bayou Teche. Delahoussaye, the Chevalier of that name, and Deblanc, have sworn to conversations, in which Athanase Hebert, the son of J. B. Hebert, the grantee of the locus in quo, told them the latter had given the locus in quo to Lesassier in exchange for a tract on the Vermillion—but these conversations are of a modern date, were posterior to the purchase of the defendants. Athanase Hebert is not shown to be either dead or absent, and no efforts have been made to procure his attendance in the district court.
We conclude that although the declaration of Le-sassier to Boutte, now dead, which was made a great many years ago, at a time when it does not appear to have had any interest to misrepresent, might perhaps be received in a case of prescription and boundaries, yet, as in the present case, it is sworn by a witness that the sale of V. Lesassier to J. B. Macarty was a public one—and the private one spoken of by Macarty is said to have been mislaid by Macarty himself, and by him alone, parole evidence cannot be received of the contents of that instrument.
The possession of the locus in quo by Macarty is attempted to be established by showing that he had a stock farm on the opposite side of the bayou, and cut wood, made a clearing, and planted corn on the other : that the general reputation and understanding of the neighbourhood was that he owned eighty ar *173 pens on each side, and that he was taxed, and paid the impositions accordingly.
1. The stock farm is sworn to have been on the western side, below, and at the distance of more than a mile (34 arpens) from the lower line of the locus in quo, which lies on the opposite western side.
It is shown that Macarty cut wood on the eastern side, opposite to the stock farm, and that his negroes one year, planted corn, in an unenclosed field, and that small logs were laid along the margin of the bayou to facilitate the passage across of the oxen which hauled the wood. The stock farm was kept from 5 to 6 years—that is to say from 1780 to 1786, and no actual occupation of any part of the whole tract claimed by Macarty appears to have been taken till 1809 or 1810, when the present plaintiffs made a settlement, on the western side of the bayou, opposite to the locus in quo. Is this such a possession in Macarty of the locus in quo as may be the basis of the prescription of thirty years ?
It is contended that the establishment of the farm, on the western side, the cutting of wood, the clearing and cultivation of land on the eastern, were acts of ownership, exercised by Macarty, over a tract of eighty arpens on each side of the bayou, of which Macarty claimed the property, and the statement of facts shows; that if the plaintiffs are entitled to reco *174 ver eighty arpens, on the eastern side, the locus in quo is included therein.
It is true that the possession of an estate is taken by entering on any part of it, and there is not any necessity of the party going into every part—but this is to be intended of a person taking possession of an estate, which the former possessor is willing to abandon to him. Pothier, Poss. et Pres. n. And if Macarty was proven to have purchased the tract of eighty arpens on each side of the bayou, which is claimed, from a person who possessed it before the sale, and was willing to abandon it to him, these acts would afford abundant evidence of a taking possession of the whole tract.
But it is different when a usurper enters, vi et armis, and drives away the possessor: he acquires possession inch by inch only, of the part of the estate, which he occupies. Pothier, loro citato.—Si cum magna vi ingressus est exercitus, eam tantummodo partem quam intraverit, obtinet, ff l. 18, de acq. poss.
Is it otherwise as to the intruder who enters without force—or in an homely, but expressive term, a squatter? When a person claims by possession alone, without showing any title, he must show an adverse possession by enclosures, and his claim will not extend beyond such enclosures. Nothing can exclude the right owner from his general possession, *175 or operate in derogation of his right, but acts of ownership, done by the intruder, which unequivocally shows a claim of title in opposition by an adversary to the rightful owner, and such as necessarily excludes him from enjoying and participating in the advantages derived from the possession. Harris and M Henry, 622. The possession of an integral part of a whole, does not include that of the other parts. So, he who possesses only one half of an estate, susceptible of division, will prescribe as to that half only. Tantum prescriptum quantum possessum.—La Porte, des Prescriptions, 48.
Macarty's possession, the extent of which is not shown, while it did not reach the lowest line of the locus in quo, and does not appear to be within a mile of that line, cannot be considered as the possession of the locus in quo, or any part of it.
Neither is it very clear that the possession shown, is of such a nature as to be the basis of the prescription of 30 years. Wood was cut, corn planted, all in a small unenclosed field, by Macarty's negroes—according to a witness—another saw wood cut, a clearing, and negroes at work. It is not likely that the last wit ness speaks of what is deposed by the first. In Grant vs. Wimburne, the supreme court of North Carolina held that feeding of hogs or cattle, building of hog-pens, cutting wood off the land, may be done so secretly that the neighbourhood may not take no *176 tice of it, and if they should, such facts do not prove an adverse claim, as these are all acts of trespass.— Whereas, when a settlement is made on the land, houses erected, fields cleared and cultivated, and the party openly continues in possession, such acts admit of no other construction than this, that the possessor means to claim the land as his own. 2 Hayw. 57.
Neither do these alleged acts of ownership, clearly appear to have been exercised early enough to be evidence of a possession of thirty years. The statement of facts shows the entry of the defendants in the early part of 1812. These acts cannot therefore avail, unless they were exercised in the early part of 1782. The testimony is, that Macarty came on the land on which Lesassier had an indigo farm, viz: on the western side of the bayou, in 1780 or 1781. The time at which he began to cut wood, at which his negroes planted corn in the unenclosed field, &c. is not specified—though, perhaps, as it is sworn there was no wood on the eastern side, the want of that article must have been felt early, and the cutting of wood could not have been delayed long.
Upon the whole, we are of opinion, admitting the alleged acts of ownership, shown to be of such a nature and of so early a date as to avail the plaintiffs, they are unavailable, on account of the place—that the occupation of the particular spot on which they were exe *177 rcised, cannot be considered as adverse to the rights of J. B. Herbert, the owner of the locus in quo, distant near a mile. It did not exclude him from enjoying any of the advantages which he did or could derive, as possessor of the locus in quo. Prescription takes place only when the owner neglects to claim, when he has it in his power so to do. Part. 3, 29, 1. The acts of Macarty were not such as Hebert could have successfully opposed. Surely, while Macarty kept within a mile from the locus in quo, Hebert required no legal proceeding on his part to protect his title.
2. The general understanding and reputation in the neighbourhood—the declarations of Declouet and Sorrel, that Macarty was the owner of eighty arpens in front on each side of the bayou, may perhaps be evidence of a title, but are surely not so of his possession.
3. Evidence that Macarty was taxed for the public works and charges of the district, as owner of 80 arpens of front on each side of the bayou, would prima facie establish his possession. Pothier, Poss. Pres. But this evidence must be legal. Now, these taxes were not laid orally. We should presume, if the plaintiffs had not proved it, that there were written documents establishing them. Berard says lists were made containing the names of each planter *178 charged, with the amount of the imposition of each. Does it suffice to say, that under the Spanish government, the public papers in the archives of distant districts, were loosely kept and carelessly preserved, without evidence of the least inquiry or effort to procure a copy of such lists ? If so, under the Amecan government, which had lasted twelve years, at the inception of the suit, we know evidence of the assessment of taxes can be easily obtained. We, therefore, conclude, that while the literal evidence of the impositions is neither produced or accounted for, parol proof cannot avail.
But a written evidence is said to exist in Deblanc's certificate, obtained by Macarty, on his petition to the intendant. This certificate is torn and truncated, has ever been in Macarty’s possession, or that of his successors, and is produced by them.—Admitting that, we can discover from it, that Macarty owned a quantity of land in the Attakapas, and among others, the eighty arpens in front on each side of the bayou, now claimed, and that it appears by the accounts of Duclosange, the treasurer, Depositario, of the district, that he has always, siempre, paid the taxes, this certificate, given in 1803, while Deblanc, the commandant of the Attakapas, was accidentally in New-Orleans, cannot be accepted as evidence, that as early as 1782, twenty-one years before, Macarty was imposed for the tract in question, *179 especially when it is in evidence, that Deblanc did not come to the Attakapas till 1796. We have here the certificate of a certificate—admitting all this to be correct, as the document has not been excepted to, we are of opinion, that the word always, siempre, although general enough, is too indefinite, and insufficient to show what must strictly and precisely be proven, an imposition for taxes as early as the beginning of the year 1782.
Payment of taxes is spoken of by Decuir and other witnesses. Admitting that such payment was made, without taking a receipt, and therefore is susceptible of being proven by parol, the precise time is not shown. Decuir says he paid, at divers times, at Macarty’s request—none of the other witnesses show any precise time of payment.
We conclude, that the possession of the locus in quo by Macarty, if shown, is not traced so far back as the beginning of the year 1782—and that therefore a possession of thirty years, before the beginning of the year 1812, is not proven.
II. Madam Lesassier’s deed being of the 12th May, 1804, admitting it to be a just title, the possession under it had lasted about eight years only, when it was disturbed by the defendants’ entry, in 1812.
III. Strong presumptive evidence that the title *180 under which the defendants claim, was surrendered is said to be discoverable in their deed. They purchased not the land itself, but their vendor's right thereto—the price is the fourth part of the value of the land—it is not payable till the title be confirmed by a decree, or the heirs of Macarty’s claim be abandoned—the deed is to be void if a deed from their vendor’s ancestor to Macarty makes its appearance—no payment of taxes is shown—no occupation of the land appears from 1777 to 1812—there has been a silence of 36 years.
1. A right or claim may fairly be the object of a sale. Pothier, Vente, 550.
2. We have no evidence of the value of the locus in quo at the time of the sale: but we are shown that the plaintiffs’ ancestor purchased the whole tract which they claim, on the 5th of June, 1809, for $20,000. This appears by the deed of sale. The defendants purchased the locus in quo, containing the eighth part of the tract, for $3,500, Jan. 6, 1813, thirty-one months after. According to the price paid for the whole tract, the locus in quo being the eighth part of it, was worth $2,500, in 1809. Now, without any other evidence, we cannot presume fraud, or that it was purchased below its value, when about three years and a half after, $3,500 were given for it.
3. While, as the plaintiffs’ counsel strenuously con *181 tends, the general understanding of the neighbourhood was, that the locus in quo, the premises sold, made part of a tract owned by Macarty, we cannot consider the precaution taken by the vendees, that the stipulated price, which appears to be the fair and full value of the land, should not be paid, till it appeared that those, who were to receive it, had power to transfer the land. The vendors had a complete patent—it is annexed to the record. Their title, therefore, was indisputable, unless a person appeared to have gained it by possession, or they or their ancestors had done some act to defeat it. Yet, the plaintiffs claimed the land, under a deed from Macarty’s heirs. Macarty’s claim was the only one to be guarded against: as it did not arise by possession, it must do so by title. This title could only be a deed from Hebert Surely nimia precautio fraus; but it was not an extraordinary precaution to guard against the appearance in evidence of a deed from Hebert to Macarty.
4. Hebert and his heirs had a complete patent, since the year 1777—it had been confirmed by the commissioners of the United States on the 27th of August, 1811. According to the statement, the defendants, who certainly did not claim the land under Macarty, as the plaintiffs, entered on it in 1812, and settled opposite the spot on the other side of the bayou, on which the plaintiffs had their settlement, undisturbed and unopposed by them. The pre *182 sumption is strong, as they did not claim title, they entered under the heirs of Hebert, whose title they purchased on the 26th of January, 1813, and remained undisturbed till the 15th of October, 1815.—Now, if notwithstanding this, the absence of any evidence of any other actual occupation renders their title suspicious, may not equal suspicion be attached to the plaintiffs' title, who never to this day, by themselves or their predecessors, had any actual occupation? After producing the original grant, proving the descent of the estate to their vendors, their deed and the possession of the defendants, was there any necessity that they should prove that those under whom they claim had been charged with the taxes of the district?
We really see no reason to presume a surrender of title. Violent, indeed, must be the presumption, which would induce us to do so, against a possessor with a complete chain of titles.
IV. The right purchased by the defendants is said to be a litigious one, although no suit was ever instituted for the recovery of the premises.
In the case of Morgan vs. Livingston & al. 6 Martin, the defendants resisted the plaintiff’s claim, on the ground that he had purchased a litigious right, having purchased from P. Bailly, a lot on the batture, which was at the time of the purchase, claimed by the *183 defendants, who were in possession of it. This court decided the vendor's was not a litigious right. Yet, in few cases could it be more obvious, that the defendants would not give up their possession without some legal struggle. We cited no authority, being of opinion that the expressions of the statute were too plain to admit of a doubt.
We are not left to ascertain the meaning of the expression litigious right, by a reference either to the opinions of commentators or the decissions of courts. The law itself has expressly given us its meaning: “ A right is said to be litigious whenever there exists a suit, and contestation on the same.” Code Civ. 361, art. 131.
It seems that a suit brought does not alone suffice—that it is not enough that there should be a petition, that a copy of it and a citation should be served on the defendant—it is necessary there should be an answer—perhaps any plea will not suffice. In the words of the statute, there must be a contestation. Now, if the advancement and progress of the suit to the contestation be essential, how can it be held that the inception of the suit is unnecessary ?
If authorities be wanted on so plain a point, we refer the student to the commentary of Gregorio Lopez, on the Part. 3, 7, 13, who observes that it had been doubted whether the thing be litigious, before the service of the petition, and he concludes that it is *184 not so—that it was not before the partida, and it has introduced no change. Febrero de escr. ch. 7, n. 9.
It was so in Rome. Litigiosa res est de cujus dominii causa movetur inter possessorem et petitorem, judiciaria conventione, vel principi precibus oblatis et judici insiuatis et per eum futuro reo cognitis. C. 8, 37, 1. Auth. Litigiosa, Nov. 112, c. 1.
The French text of our code civil is a literal copy of the art. 1700 of the code Napoleon, and in the case of Delaunai vs. Delanci, the court of appeals, in affirming the judgment of the tribunal of Rouen, observed that it was improper to confound a thing liable to litigation, with a litigious one. 11 Jur. Code Civil, 451. When the thing ceded is not contested, and is not the subject of a suit, at the time of the cession, the thing is not litigious. 13 Id. 49. 13 Pand. Fr. n. 119.
We conclude, that, as there was no suit instituted in the present case, at the time the defendants purchased the right of Hebert’s heirs, they did not purchase a litigious one.
It is, therefore, ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed, and that there be judgment for the defendants, with costs of suit in both courts.
***There was no case determined in October or November.